Booth, Chief Justice,
delivered the opinion of the court:
The plaintiff, a New Jersey corporation, sues to recover upon a number of items which may be best discussed in their order. The plaintiff in the summer of 1916 consulted with and interested the War Department in its previous experiments with the manufacture of illuminating shells. A demonstration of plaintiff’s 2.18" shell occurred in January, 1917. The War Department complimented plaintiff’s achievements in this instance, and the written report to this effect was forwarded to the Bureau of Ordnance and to the British War Office. The War Department awarded a contract to the plaintiff to manufacture some star shells for a 2.75" trench smooth-bore mortar, and thereafter the plaintiff continued its experimentations with other and additional designs. Plaintiff’s chief engineer was directly responsible *331 for its activities in star-shell designing and experimentation, and as will subsequently appear patents were applied for and granted covering the invention. Plaintiff’s success with the War Department encouraged its contact with the Navy Department. On February 5, 1917, it requested the privilege of demonstrating the utility of its star shells to the department. The Navy Department had not accomplished success in obtaining a star shell for long-range guns. The department’s difficulties were peculiar to its own style and caliber of ordnance, and of course the proper officials welcomed the plaintiff’s suggestions. After some correspondence and personal interviews the plaintiff disclosed to the Navy Department its detailed drawings of a 3" star shell, at the same time advising the department of its purpose to manufacture small star shells for unrifled cannon, which would develop the degree of velocity the department desired to obtain. The Navy could not utilize the trench mortar or the star shell developed for the War Department. The Navy was using high-velocity guns and star shells inserted therein had to be so designed as to meet this condition. Following a variety of changes and modifications, brought about by correspondence and interviews, the Navy Department in June, 1917, entered into an experimental contract with the plaintiff, contract #1099, for the manufacture of ten 3", star shells of plaintiff’s design. It is sufficient to say that shells covered by the contract proved unsatisfactory. Thereafter, upon receipt from the British Admiralty of the specifications and drawings of the British 4" star shell, the department became convinced that such a shell was available, and invited proposals from the plaintiff to manufacture 25 such shells for experimental purposes. A contract was awarded the plaintiff for so doing on February 15, 1918, by the terms of which the plaintiff was to make 20 shells of each of two designs submitted by the British Admiralty, and five of its own design, i. e., 45 in all. Under this agreement plaintiff, with modified suggestions of its own, made and subjected to test the shells called for. The test was not satisfactory. Whereupon the plaintiff proceeded to perfect its own design, and as a result of a test the department was satisfied as to *332 the plaintiff’s 3" and 4" shells. Plans and drawings were furnished the proper bureau of the department, and in June, 1918, a contract was let, whereby the plaintiff was to manufacture and deliver 20,000 each of its 3" and 4" shells. It is this contract, to which all others are preliminary, known as #39716, subsequently supplemented by contract #39716-A, which gives rise to this litigation.
The manufacture of star, or, as technically known, illuminating shells, was an entirely new adventure in this country. The plaintiff’s enterprise was pioneer in character and to accomplish success the Government agreed to a cost-plus contract which involved, among other items, the erection of a suitable plant upon a site at Baldwin, Nassau County, Long Island, near plaintiff’s aeroplane and machine shops, the site to be provided by the Government. In addition to cost of plant the plaintiff was to be paid an engineering fee for services in connection therewith and also the cost of all experimental work carried on by plaintiff. It is to be noted that the original contract, No. 39716, was concerned alone with 3" and 4" star shells. Plaintiff had not at this time perfected to its satisfaction a 5" star shell. The bureau also desired a 5" shell. Without going into detail as set forth in Finding X, it is enough to say that contract No. 39716 was increased by contract No. 39716-A to include the manufacture of 5" shells. Notwithstanding assurance that contract No. 39716 would be closed as of July 1, 1918, it was not signed by the Government until July 27, 1918. This delay, however, did not militate against the plaintiff’s performance; on the contrary, plaintiff began preparations toward performance at once and proceeded to prepare and forward orders for materials and supplies. The manufacture of a delicate mechanism like a star shell, especially when in a more or less experimental state, compelled the consumption of much time in the fabrication of the essential materials. The plaintiff endeavored to anticipate this source of delay and forwarded to the bureau orders for materials, some prior to the execution of the contract. A contract made in the midde of the year 1918, irrespective of its subject matter or importance, was absolutely certain to encounter the delays incident to the establishment of boards and com *333 missions vested with jurisdiction to conserve the national resources. This fact was publicly known. Materials were available only in many instances through the priority .orders of the War Industries Board, and the processes of the bureau through its supplies and accounts division were the usual method of securing approval of purchase orders. Cost-plus contracts exacted strict inspection, and it was to be assumed by the contractor, knowledge of conditions being inescapable, that delays would occur. As a matter of fact, the table of delays set out in Finding XXV indicates what might have been anticipated. Of course, the Government was obligated to facilitate performance to the extent of its ability, but there is nothing in the record to warrant a holding that the interposition of this so-called “ bureaucratic red tape ” put the plaintiff to a decided disadvantage. The plant was in process of construction during this period; quantity production could not proceed until it was completed. A site for the same was to be condemned and a contract let to construct. Originally the estimated cost of the plant was fixed at $67,121.00, afterwards increased to $124,141.00. The numerous changes and additions to the original conception, keeping in mind the engineering fee of $2,000 paid the plaintiff, disclose a premature conception of the necessities of the plaintiff in the original plans for the building. At the time the contract was canceled the plant was substantially complete, but many details remained to be completed before quantity production could be attained. The plaintiff charges the delays in the performance of the contract were attributable to the defendant’s inspectors. An allegation is made, and said to be supported by proof, that the naval inspector and his assistant detailed to inspect performance were incompetent; that they adhered too rigidly in minor matters to established bureau procedure, and constantly refrained from accepting responsibility in the matter of urgent authorizations for materials, etc. It is manifest from the record that intense hostility soon developed between the contractors and the inspector and his assistant. A most formidable record on this issue appears in the testimony. In reconciling this acute conflict it has been impossible for the court to fix the blame. It is to be said, however, that the contractor *334 was aware of the necessity for inspection, and it is to be observed that in addition to a cost-pins contract the article to be manufactured must meet the requirements of the contract in a way where test and inspection were vitally important factors. While time was of the essence of the contract, and the shells were urgently needed, neyertheless it may not escape attention that a successful star shell had not so far been designed, and the success of the venture depended upon cooperation between the parties. The inspectors were under obligations to speed up production and oversee manufacture; their responsibility is not to be minimized, and such a service when it runs counter to a contractor, possessed of equal zeal and under, the same weighty obligation, is clearly capable of producing friction. The court is of the opinion, that in so far as this relationship was responsible for delays, one party was about as equally to blame as the other. The Navy Department about October 4, 1918, desired the completion of 1,000 3" shells for shipment abroad. The plaintiff responded to a request for expedition that it must change the design of the shell. This was finally done under an authorization to manufacture 5,000 of the changed design. The new design was tested at Indian Head on October 11, 1918, and was approved. None of these shells were made, however, for the reason that on November 23, 1918, plaintiff’s contract was terminated. The letter terminating the contract ascribed two reasons for bringing it to an end: Unsatisfactory progress toward completion and the signing of the armistice. Clause 18 of the contract provided as follows:
“The department shall have the right to terminate this contract at any time as its interest may require: Provided, That if terminated before the completion of the work herein provided for a just and fair settlement shall be made with the contractors.”
On November 23, 1918, the plaintiff by letter protested against the cancellation of its contract, pointed out a lack of delay upon its part, and asked to proceed therewith. The protest was of no avail. The bureau subsequent to termination obtained permission from the department to take over plaintiff’s employees, i. e., such as the inspector *335 in charge deemed available to operate the plant, and they were afterwards transferred to the Government pay rolls. The plant was operated by the Government, a plant designated “ The United States Naval Ordnance Plant, Baldwin, Long Island, N. Y.,” and has been continued in operation as such. Practically all the plaintiff’s possessions relating to the manufacture of shells, far too many to enumerate in detail (Finding XXII), passed into the Government’s possession, and with the organization of plaintiff intact, except as to executive officials and the chief engineer, the Government within sixty days after termination was producing shells. Within 90 days thereafter the entire plant was in operation. (Finding XXII.)
The plaintiff predicates its right of recovery on this phase of the case by asserting proof of the fact that the acts of the Government in terminating the contract constituted bad faith, the plaintiff insisting that despite governmental interference it was proceeding in an orderly and expeditious way toward performance of the contract, and that the termination order was prompted by personal hostility toward the plaintiff, apparent from the reports and unjust recommendation of the inspector in charge and his assistant — reports and recommendations upon which the Government acted in terminating the contract. A judicial conclusion as to the establishment of bad faith must rest upon a substantial and convincing foundation. A court would not be justified in indulging the inference that responsible officers of the Government arbitrarily invaded plaintiff’s contractual rights and exercised a reserved right to cancel a contract because of personal animosity toward the contractor, unless the proof adduced to sustain the charge is extremely clear and free from irreconcilable conflicts. Ripley v. United States, 220 U. S. 491. It is no more than just to the contractor to say that one reason given for termination, i. e., alleged delay in performance, is not sustained. The case, however, is not limited to the exercise of the right for this single reason; on the contrary, the termination clause is comprehensive and recites the right to terminate “ as its interest may require.” The Government enters into a war contract on a cost-plus basis; the right of termination is reserved “ as its *336 interest may require.” Proof conflicting and irreconcilable obtains as to friction and discord during the performance of the contract. The Government needs the ordnance and needs it badly; the prospect of cooperation is discouraging, when suddenly the war terminates. The needs of the Government become less acute, expense is accumulating, a prolongation of manufacture on a cost-plus basis may be deemed inadvisable, and the officials conclude that economy may follow termination, and innumerable other reasons enter into the question of the vital interest of the Government. When the court adds to the above consideration the fact that the ill feelings and conflict between the contractor and the inspectors must be shown to have influenced the officers of the department, whose subordinates they were, and carry into every detail of this particular transaction the element of bad faith, we find ourselves unable to do it. Obviously, the source of friction was due to plaintiff’s impatience with departmental procedure. The plaintiff preferred direct dealings without the necessity of so many references and approvals. The inspectors on the other hand were not at liberty to waive these requirements, and the regulations and procedure of the department were not inimical to good faith in the matter of performing cost-plus contracts. The Government bore substantially all the expense and it had a right to establish means for its accurate ascertainment and requirement. The fact that the Government continued operations and within ninety days from the date of termination was producing star shells is convincing proof that with friction removed the difficulties in performance disappeared. We are convinced that the contention of the plaintiff, founded upon a breach of the contract on the basis of bad faith in its termination, is without merit. We think it was for the best interests of the Government to terminate the contract.
The termination clause of the contract provided “ for a just and fair settlement” with the contractor. The provision is somewhat unique in that no specific basis for settlement is stated in the form of cost of materials, actual money paid out, etc. While it needs only a statement to demonstrate that items of this character are to be included in the *337 settlement, the language used indicates a comprehension of something more than actual outlay. A just and fair settlement obviously contemplates remuneration as the equities of the case suggest. The Government has paid the plaintiff $283,011.23. (Finding NXVI.) This amount covers certain fixed charges and one item of profit. The plaintiff’s contention for an additional allowance is rested upon a computation wherein the ratio of profit to total cost of performance is fixed at 8.56%. Prior to termination plaintiff had given and the department had approved orders in pursuance of which the plaintiff had entered into subcontracts totaling $556,001.09 and had entered into correspondence for the furnishing of materials, the value of which was $92,035.58, making a total of $648,036.67 ; 8.56% of this amount totals $55,471.94, and this sum is claimed as a fair and just settlement for services rendered in connection with the items mentioned. The defendant challenges the right and points out errors in the justness of the computation. The preliminaries of a new organization are of vital importance, especially so in a case of this nature. Superintendence of the erection of a building, and orders for plant equipment and materials, require a high degree of service, but, as emphasized by the defendant, this character of service falls upon the officials of the organization — it is overhead expense and is to be absorbed usually in profits realized. The plaintiff having been denied all its anticipated profits, a just and fair settlement, it contends, indisputably requires payment for such expense. The trouble with the plaintiff’s contention is that it has been paid sums representing this expenditure. Whether in all respects it has been paid enough is another question. As to some of the items it is clear the plaintiff may not recover. The plaintiff agreed to accept $2,000 as an engineering fee in connection with the erection of the plant, and this sum it received. Factory overhead and general administrative expenses were fixed at $28,890.67, and this sum has been paid, evidently ascertained upon a proportionate basis of actual expenditures allocated to this contract, including salaries of the corporation’s officials. It is difficult to perceive a more accurate ascertainment of facts *338 for reimbursement than allocation of overhead to the particular contract involved. At any rate, it is the established method. That plaintiff was fully reimbursed for expenditures for labor and materials is not denied. A profit upon completed work under the contract of $4,949.55 was paid. Plaintiff’s claim of 8.56% of all outstanding obligations, as well as amounts expended, is a claim predicated upon profits rather than a showing of the value of services rendered. There was much' more to be done by the plaintiff before it earned a profit of 10% under the contract, and the contract made no provision for the payment of profits upon materials ordered but not as yet used. The court is not to award damages. The plaintiff by signing the contract contemplated the situation which came about. The defendant’s contention as to a just and fair settlement, except possibly one item, is apparently limited to reimbursement. The settlement made contained but one item of profit and is predicated wholly upon the inclusion in the sum allowed for general administrative and factory overhead as sufficient remuneration for services performed. This, we think, is not fair nor just. The defendant on the date of termination was enabled to avail itself of a competent organization, a substantial going concern, an organization adapted to the production of a single article salable with profit to a single customer, an identity worth more in its then condition than the cost of organization, certainly worth much more to the plaintiff. A smoothly functioning organization developed almost to the point of perfection would have a market value in excess of the sums expended to bring it to this point, and the defendant obtained this identical advantage. Therefore, in view of the wording of the termination clause and the intent of the parties in assenting to the same, it is not fair nor just to restrict compensation to the precise limits of remuneration. What we mean is illustrated by the fact that within 90 days after the termination of the contract the defendant, with the organization in substantially the same condition as when taken over, had attained quantity production. Surely within the meaning of justice and fairness the plaintiff is entitled to an allowance over and above cost for the loss of time and service expended in creating such a condition. *339 The defendant recognized the justice of such an allowance; it even now concedes an allowance for materials delivered but not incorporated in the work, and offered to plaintiff an additional $10,000 to cover all claims arising under the contract. The plaintiff declined the offer, asserting its inadequacy. We think the plaintiff was right. Aside from the issue involving patents, we think that the plaintiff would not be made whole without this additional allowance. It is somewhat difficult to fix the amount, but in view of the magnitude of the undertaking, the perplexing problems involved, and the amount of labor exacted, and also taking into consideration the sums expended and interest on borrowed money, we think $35,000 is fair and reasonable.
PATENT RIGHTS
The plaintiff alleges infringement of certain claims of four letters patent. The usual defenses are interposed and the case upon the issues presented brings forth a voluminous, contentious, and much involved record.
The plaintiff’s assignor and chief engineer, Axel G. Bergman, filed on February 17, 1917, an application for a patent on certain new and useful improvements in illuminating projectiles. This application, #149260, finally on May 27, 1919, matured into issued patent #1305186 and divisional patent #1305188. Two other applications by the same inventor resulted in issued patents, viz, #1305187, on May 27, 1919, and #1381445 on June 14, 1921.
The first infringement claimed relates to claims 1, 2, 3, 4, 6, 8, 9, 10, 11, 15, 16, 17, and 18 of letters patent #1305186. The claims, we think, may be grouped. Claims 1, 2, 3, 4, and 6 are as follows:
1. A projectile having an illuminant, a sustaining device therefor and means adapted to check the speed of the illuminant at high velocities previously to the operation of the sustaining device.
2. A projectile having an illuminant, a sustaining device therefor, and a parachute adapted to check the speed at high velocities previously to the operation of the sustaining device.
*340 3. An illuminating shell having a sustaining device and a retarding device for a portion of its contents operating previously to the sustaining device.
4. An illuminating shell having a sustaining parachute and a retarding parachute operating previously to the sustaining parachute.
6. An illuminating shell having a retarding parachute, means for bringing said parachute into operation, an illuminant, and a sustaining parachute for said illuminant acting after the operation of the retarding parachute.
The conception of the inventor, deducible from the claims now under consideration, is the recognition of the vital necessity for a sustaining device and a means to retard, speed. A star shell discharged from ordnance encounters the force of the discharge of the projectile encasing the illuminating star shell and the great velocity attained by the projectile in its passage through the air. The difficulty from a practical point of view had long existed of perfecting devices capable of sustaining the destroying influence of the force of the discharge from the Navy’s guns and so functioning in midflight as to sustain the illuminant a sufficient length of time to illuminate the desired area. A parachute had long since been employed as a sustaining device; the impediment in the way of its utilization in a star shell was its inability to sustain the illuminant in the air because of slitting or damage due to the excessive speed at which the projectile from the gun was traveling when the illuminating device was released therefrom. In other words, it was essential to first check the velocity of the star shell so that the parachute might open under conditions of less speed and thereby sustain the illuminant in the air, i. e., retard its progress towards the ground until the illuminating element had been consumed. All of the above claims clearly indicate a conception of the essential functioning elements of a device to attain the desired objective, and this was accomplished by the inventor specifying two separate elements, i. e., a retarding parachute, a means to retard speed, and a sustaining parachute to sustain the star. .A small parachute, with means for bringing the same into operation, functioned *341 upon opening to check the speed of the illuminant and thereafter a larger parachute functioned to sustain the illuminant in the air to a degree of slower process in descending to the ground.
The invalidity of the foregoing claims is asserted. Seven patents relied upon as prior art are cited. Patent #1178304 granted to Dutcher April 4, 1916. The inventor discloses a device, a container for messages adapted to be dropped from an airplane. To accomplish the purpose a parachute arrangement is employed. Page 1, line 100, of the patent reads:
“ When the signal is released it should fall rapidly and be little influenced by air currents until it is close to the earth, and in that way the signal can be prevented from drifting away from the point it is desired to deliver it.”
The predominant conception of the inventor as disclosed was a mechanism adapted to deposit a message from an airplane in or near the exact location desired. The container contained an illuminant so that when the message was dropped at night it could be readily located. The parachute’s part in the operation of the mechanism was adapted to unfold when the container had fallen to within 100 or 200 feet of the ground, and the purpose to be accomplished was to so retard the speed of the container that violent contact with the ground would not destroy the message but prevent loss of the same. The parachute arrangement involved a suspension of its functioning by being restrained or tied down near its middle part during the initial portion of the flight, with means to release it as it approached its destination.
The problem which confronted Bergman was not the retardation of speed toward the close of the flight. What Bergman did was to employ two elements — two parachutes — one functioning to check velocity during the initial portion of the flight and another to sustain the illuminant in the air the maximum period of time. The success of Dutcher’s device depended upon speed, while Bergman was seeking to overcome the existence of the same. It was neither new nor novel to employ a parachute as a sustaining *342 device; the principle had long since been demonstrated. The examiner cited the.Dutcher patent as a reference in the office action of May 3, 1918, and also referred to it in subsequent actions, finally allowing Bergman’s claims in their present form.
The French addition patent 19368 and French patent 451289 utilize parachutes in a disclosure of a device designed to afford safe descent to the occupant of an airplane, as well as protect the plane itself in case of emergency. Patent 19368 embodies a structure comprised of a series of parachutes of decreasing size, the largest being attached to the top of the suspension parachute and the others being attached to the top of its predecessor. In this order they were encased in a tube and so arranged that when put to use the smallest one is first projected from the tube operating against air currents with sufficient force to draw from the tube the next one, and so on in succession until the final and large parachute is released. The inventor by the disclosure was seeking by this multiple arrangement of parachutes in series, and varying in size, to obtain certainty in operation of the final or large parachute relied upon to sustain the weight in supposed safe descent. It resembles the patent in suit to the extent of using multiple parachutes. There is no suggestion of the use of one or more of the graduated smaller parachutes to retard velocity or check the speed attained by an airplane or an airplane operator in emergency. Almost instant operation is essential, and the smaller parachutes were of course insufficient to sustain weight of any consequence. The aid they supplied in the relationship accorded them was to withdraw the dependable, the large one, from the container so that in its natural way it could unfold, the smaller parachute in no way contributing to the natural functioning of the large and dependable one. They might have been dispensed with without impairing in every instance the operation of the substantial parachute designed to retard speed and assure a safe landing. As a matter of fact, the whole conception indicated a design to obtain speedy and almost instant operation in the interest of assured safety. The inventor does not disclose the functioning of a parachute to reta/rd velocity as a necessary *343 precedent and essential factor to afford operative effect to another one. The novelty is more a matter of arrangement rather than unusual operativeness. French patent 451289 is confined along the same lines and subject to the same limitations. A small parachute is utilized in combination with a large one to liberate the latter from a folded condition, releasing the means employed to compress the large parachute into its compact condition, so that it may promptly function. The relationship between the two parachutes was in nowise unusual. One, the smaller, functioned to release the means adapted^ to maintain the other — the larger- — in a folded condition so that it would be free to function independently. The smaller parachute in no way contributed to the functioning of the larger one; its place in the patent was as an element to force from its bounds the larger one, strip it of the impediments to its instant operativeness, and thereafter the effectiveness of the larger one depended upon its own inherent qualities for proper functioning.
United States Patent to Maul, #757825, and British Patent #12772 to the same inventor present a parachute structure identical in function with Dutcher’s patent #1178304 {supra). Dutcher’s conception embodied the safe discharge of messages from high altitudes and Maul conceived the idea of photographs from an altitude of 1,600 or 1,700 feet. The means employed in both instances were not dissimilar.
United States patent #1186230 to Piches, embodying an aeronautical life-saving device disclosed a plurality of parachute sections ranging one below the other, each being of relatively larger proportion. The device functions in a manner identical with the disclosures in French addition patent #19368 and French patent #451289.
The United States patent #1207520 to Fabiani discloses again the employment of a plurality of parachutes functioning to lift or pull up a cross-member adapted to arm a bomb, a central idea being to time the discharge of the bomb in its course through the air before its contact with the ground. This patent was cited by the Patent Office in its first action on the Bergman application, which finally matured into patent #1305186. A British patent to Holt, #10816, is attempted to be utilized by the defendant as in *344 dicative of the fact that a signal provided with a parachute adapted to be dropped from an airplane is an analogous use to a signal adapted to be fired as a projectile. No attempt to use the patent as prior art is made, it being conceded that the date thereof precludes such a possibility.
The opportunity for invention, as limited by the group of claims now under discussion, is, we think, confined within a very narrow channel by the prior art. Bergman was confronted with a problem which entailed two predominant factors. A successful star shell timed to illuminate at any given point in the trajectory of the projectile discharged from a Navy gun necessitated a degree of retardation of the intense velocity of the illuminant prior to the operativeness of a sufficiently large parachute to sustain the same in the air. Prior experiments had demonstrated the ever-present factor of destructiveness due to the velocity of the shell. Without some means to retard velocity no sustaining parachute could withstand the intense pressure of the velocity of a shell discharged to reach a point miles distant from the location of the gun. It was not the question of using in the first instance a means to free a parachute from a container so that it might function normally. It involved the prime necessity of means for slowing down to the necessary extent the illuminant so that a sustaining parachute might operate at all. If you eliminate from Bergman’s device the speed-retarding means so that a large parachute may function to sustain the illuminant, the problem so long under experiment remains unsolved. The prior art demonstrates beyond peradventure the availability of parachutes as a means to retard velocity and as sustaining devices, but there is nothing in the disclosures relied upon anticipatory that even remotely brings to the surface a suggestion of a conception of the employment of a parachute as a retarding factor adapted to afford operativeness to a sustaining parachute by preventing the destruction of the same. Inasmuch, therefore, as the necessities of the case called for a device adapted to function in this respect, in two separate and distinct ways, i. e., one to retard force as a condition precedent to effective operativeness, it is, we think, established that Bergman to this extent overcame the difficulties and created the combination. In so *345 doing Bergman undoubtedly employed elements old in the art, capable of being utilized as he utilized them, and if his alleged invention involves no more than imitation of existing uses or seizing upon a prior patent to adapt it to a double use, which those skilled in art would readily perceive, what he did was not invention. The issue turns upon “ nonanalo-gous ” or “ analogous ” use. The following syllabus from the case of Canda v. Michigan Malleable Iron Co., 124 Fed. 486, is apropos:
“A patent otherwise valid is not void for anticipation because a prior patent covers a device which might be so constructed as to be capable of the same use as that of the later patent, where the prior patent- gives no sign that such use was contemplated and no specific directions for such construction.”
Again, in Mallon et al. v. William G. Gregg & Co., 137 Fed. 68 (syllabus):
“The application of an old machine or combination to a new use is not in itself invention or the subject of a patent. It is only when the new use is so recondite, or so remote from that to which the old device has been applied or for which it was conceived, that its application to the new use would not occur to the trained mind of the ordinary mechanic skilled in the art seeking to devise means to perform the desired function with the old machine or combination before him, that its conception rises to the dignity of invention.”
While the degree of remoteness in the art in the present instance is not emphatic, whatever else may be said it is indisputably true that, despite experimentation by the skilled mechanics of the Navy Department for some years in an effort to perfect star shells, the Bergman invention escaped them. Not only is this fact established, but in addition the Bergman invention proved to be practical, successfully operative, and of commercial value; thousands of star shells in accord therewith have been manufactured by the Government. Inventors who preceded Bergman in the use of multiple parachutes were concerned with overcoming difficulties of a different nature. Within the purview of their conceptions no disclosure indicates a utilization of multiple parachutes adapted, one as a retarding force to effectuate *346 the operativeness of a second sustaining one without damage in a swiftly moving projectile. In practically every single instance the combination of parachutes was designed to sustain weight, the use of additional ones was simply an added element adapted independently to exert force upon the one relied upon to assure its release from some convenient and compact manner of inclosure adapted to convenience in carriage. What was utilized was the balloon principle of descent, a combination in no way involving the complexities of releasing from a projectile fired from a high-powered Navy gun, a star shell, a device ejected from a projectile traveling at high speed and involving essentially the overcoming of the destructive qualities of intense velocity. The question of nonanalogous use we grant is quite a close one; nevertheless, in view of the record, we think it is sustained. Bergman, it seems to us, did conceive a new and novel use of plural parachutes, a use distinct from prior conceptions and involving invention. It was, to say the least, the application of a use, which had not theretofore suggested itself to those skilled in the art, notwithstanding a diligent search and persistent effort to solve the problem and produce a successful star shell.
Claims 8, 9, 10, and 11 form the second group. We reproduce them from the patent:
“ 8. A shell having an illuminating charge, means for expelling the illuminating charge out of the shell in a direction opposite to its line of flight, and means for sustaining the illuminating charge after expulsion.
“ 9. A shell having an illuminating charge and a sustaining parachute, means for expelling the charge and parachute out of the shell in a direction opposite its line of flight, and means for retaining the illuminating charge in fixed position within the shell previously to its expulsion.
“10. A shell having an illuminating charge and sustaining means therefor, means for expelling the charge and sustaining means out of the shell in a direction opposite to its line of flight, and means for retaining the illuminating charge fixedly within the shell previously to its expulsion therefrom.
“ 11. An illuminating shell having a portion of its contents designed to be expelled therefrom, means for expelling said contents from the shell in a direction opposite to its line *347 of flight, and devices acting to retain said contents in fixed position within the shell previously to its expulsion therefrom.”
The detail construction of Bergman’s device is best disclosed by the inventor’s drawings.
The number of elements essential to operativeness and the delicate arrangement of the parts employed suggest at once the opportunity for invention. As previously observed, the one important obstacle to overcome was force. The discharge of the shell from the gun set up a rotary motion of intense velocity and subjected it and its contents to great pressure. The essential element of the device was the star. Toward this illuminant all other means were directed, for if it failed to function the invention was worthless. Bergman by the terms of the above claims clearly discloses a new and novel method “of expelling the illuminating charge out of the shell in a direction opposite to its line of flight.” In other words, he succeeded in ejecting the illuminant and the essential means to sustain it in the air by releasing the base of the shell and sending it backwards instead of forwards. By so doing he did, to a certain extent, counteract velocity and materially facilitated the operation of the device. Unquestionably he removed the danger of having the illuminant destroyed by the body of the shell, when the former had been expelled through the forward part or nose of the same. To accomplish this required a conception of a shell base of sufficient strength to withstand the shock of the initial firing in the gun, and at the same time yield to the expulsive pressure from within the shell. The defendant seeks to discredit the patent by citations from the prior art, which we believe requires little comment. British drawing #47 and others from the same source of a similar character were not received by the Navy Department until November, 1917, some nine months after Bergman filed his application, and were not available to the public anyway. The Noyes patent #52314 obviously has no bearing upon the Bergman invention. The Navy Department’s drawings #2252 represent little else than an abandoned experiment, so that in our view of the record these claims stand forth as novel, involving invention and unimpeached.

*348

*349 The next group involved consists of claims 15, 16, and 17:
“ 15. The combination of a projectile comprising an illuminating body, said projectile having means for sustaining the weight of the illuminating body which is of such fragility as to be incapable of overcoming the momentum of said body at high service speeds, and said projectile having means for overcoming such momentum of said body sufficiently to bring the latter within the capacity of said sustaining means.
“ 16. A high speed illuminating projectile for long range guns adapted to operate and ignite the illuminant at any one of a number of different points in the trajectory of the projectile as predetermined by the user, and means for retarding and subsequently sustaining the illuminant at any such predetermined point, the retarding element being adapted to relieve the sustaining element of excess strain.
“ 17. A high speed illuminating projectile for long range guns containing an illuminant, and timing means for igniting the illuminant, said timing means adapted to operate at any one of a number of different points in the trajectory of the projectile, and means for retarding and subsequently sustaining the illuminant at any such predetermined point, the retarding element being adapted to relieve the sustaining element of excess strain.”
Claim 15 is manifestly similar to claim 1 of the first group. The difference is an amplification or, rather a limiting functional statement with respect to the sustaining and retarding means, i. e., the multiple parachutes. It points out definitely the fragility of the sustaining device and emphasizes the necessity of overcoming momentum. The challenge to the claim’s validity is predicated upon the same citations and assertions urged against claim 1, as heretofore discussed.
Claims 16 and 17 disclose practically the same combination as claim 15, adding thereto the illumination and ignition of the illuminant at any one of a number of different points in the trajectory. Ignition is accomplished by a time fuse or mechanism, and embraces within the disclosure a more specific claim for the shell mechanism than is disclosed in the first group of claims. While time fuses are old, we think the novelty predicated upon the combination of elements set forth in claim 1 is sufficient to carry claims 16 and 17, irrespective of this additional element.
*350 Claim 5 reads as follows:
“ 5. An illuminating shell having a retarding device adapted to check the speed of a portion of its contents, at high velocities, a timing device adapted to set in operation said retarding device, and a sustaining device which acts after the retarding device.”
This claim simply employs broader phraseology than claim 17. If one is valid, we think validity attaches to the other.
Infringement is also predicated upon claim 18. The claim includes as an element “means for preventing the tumbling of the shell.” By reference to the specification and drawing of the patent, this element is found in the vane A appended to the rear of the shell and functions as the feathers of an arrow. No such structure is found in the Government shell in which tumbling is prevented by the rotation or spinning of the shell imparted to it by the rifling in the gun from which it is fired. Defendant attempts to read this phrase upon the copper band of the shell, but this is, we think, tortuous, and this claim is therefore considered not infringed, and no discussion of its validity is necessary.
PATENT #130518.S
This patent, as previously observed, is a division of the application which materialized into patent #1305186. Three claims, 1, 3, and 8, of the patent' are alleged to have been infringed. The claims read as follows:
“ 1. An illuminating projectile having an outer casing, an inner casing, a retarding parachute fastened to said inner casing, an illuminant within said inner casing, and a sustaining parachute also within said inner casing, and connected to said illuminant.
“ 3. A projectile having an illuminant contained therein and an automatically separable rigid wall positioned laterally of the illuminant and acting to protect the illuminant from excessive explosive shocks.
“ 8. An illuminating projectile containing an illuminant and sustaining means adapted to be discharged therefrom, an expelling charge, and separable means cooperating with said illuminant and sustaining means and acting to house the illuminant and sustaining means and also to receive the *351 force of said expelling charge, whereby said contents can be discharged from the projectile without receiving a direct strain.”
Claim 1 is clearly not infringed, for it calls for a construction involving a retarding parachute fastened to an inner casing and a sustaining parachute within said inner casing and connected to an illuminant also within the inner casing. No such construction is found in any of the Government structures. The plaintiff evidently appreciates this, for on page 2554 of its brief the statement is made that “ claims 3 and 8 are relied upon.” This claim is not infringed.
United States patent to Ziegenfuss, #1003082, is said.by the defendant to be anticipatory of claim 3. Ziegenfuss does disclose a star shell in which a plurality of segmental wings of rigid material are folded in an overlapping manner, thus forming a segmental inner casing around the illuminant. When the shell bursts, by virtue of a time fuse, these segmental members are spread out by means of springs so that they will function as a kind of parachute during the falling of the illuminant or “ candles,” of which there are several. From the construction shown, these segmental wings form an automatically separable rigid wall positioned laterally of the illuminant, and obviously function as disclosed in claim 3 of the above patent. The claim for this reason we believe to be invalid.
Claim 8 is much more specific in phraseology than claim 3; it discloses the “ separable means cooperating with the illuminant,” but in addition includes a sustaining means, so that this claim differs from the Ziegenfuss claim in specifically calling for additional elements not present therein.
Defendant also cites British drawing #24843. This drawing is referred to in Finding XL. We have heretofore pointed out that the same was not available to the public at the time Bergman made his application. We think claim 8 to be valid and infringed.
PATENTS #1305187 AND 1381445
The application for patent #1305187 was filed on January fi, 1919; letters patent were issued May 27, 1919. Plaintiff alleges infringement of claims 1 to 29, inclusive.
*352 The application for patent #1381445 was filed on July 20, 1919; letters patent were issued June 14, 1921. Infringement is claimed.
An extended discussion of the patents is unnecessary. Both of the above disclosures embody improvements over the prior patents of the im^entor, and were the result, we think, of the experimental and development contracts entered into with the Government, which the Government financed in addition to paying the plaintiff a wholesome and remunerative consideration for the development accomplished. In considering the geñeral question of infringement, these same experimental contracts are relied upon by the Government to preclude a judgment for infringement of any patent rights involved, on the theory of an implied license to use. The proceedings antedating the principal contract in the case disclose certain preliminary negotiations. (Findings II, III, IY, Y, VI, VII, and VIII.) The Navy Department’s experimentations had failed to develop a star shell suitable for use in its long-range guns of high velocity. The department’s structure yielded to the force of the “ setback ” and the mechanism was crushed to an extent to render it inoperative. Bergman’s invention interested the department and through conferences and communications it was finally resolved on June 11,1917, to enter into a contract, known as #1099, by the terms of which the plaintiff agreed to manufacture ten 3" star shells of its own design for $5,000.00, the Bureau to furnish shell bodies, standard 3" shrapnel nose pieces and fuses. The contract demonstrated, if not the impossibility, at least the impracticability of utilizing the Navy shell for the desired purpose. The nose-ejection type of naval shell could not be modified into a base ejection shell, and the plaintiff resorted to its own type as specified in Bergman’s first patent. These last shells were successfully tested and duly inspected.
In November, 1917, the department received the British drawings for a 4" star shell. Proposals were solicited from the plaintiff for the manufacture of 40,000 4" star shells to be based upon the British design, and 60,000 3" shells of the same design. Thereafter, it was discovered that the *353 British shell did not function satisfactorily, and the plaintiff and defendant entered into a second experimental contract #35072 signed February 15, 1918. This contract embraced the development of 25 3" and 25 4" shells along the lines of the British design with such essential modifications as would render them suitable to the shell body furnished by the department. The effort resulted in a final modification of the contract itself by the terms of which the plaintiff was to manufacture 20 each of the several sizes based on the British design, and 5 each of the several sizes based upon its own design. The 20 based on the British design proved unsatisfactory; the 5 of its own design were tested and proved satisfactory. The plaintiff prepared drawings of its own design and at once submitted them to the department. Subsequently on June 17, 1918, contract #39716 — the contract involved in the case — came into existence. During the course of these experimental contracts the improvements covered by patents 1305187 and 1381445 were the result of the necessity to overcome the difficulties and imperfections disclosed during the course thereof. Except for the development processes carried on at the expense of the Government, under its supervision and with its suggestions in collaboration and contractual relationship with the plaintiff, these patents would not have come into existence. We need not multiply the citation of authorities to sustain the rule that where one is employed by another for development and experimental work the result of the relationship is an implied license to the employer to use whatever invention develops from the experiment. As stated in defendant’s brief: “An employee employed to invent creates for his employer, and an equitable ownership of the employer in the employee’s creation will be enforced.” Solomons v. United States, 137 U. S. 342; McKinnon Chain Co. v. American Chain Co., 259 Fed. 873. As to patents 1305187 and 1381445, the charge of infringement fails.
INFRINGEMENT OF PATENTS #1305186 AND 1305188
Quite a different situation obtains with reference to the existence of an implied license to use when applied to the *354 above patents. These two patents were not conceived as a result of the experimental contracts. They antedate the processes of experimentation. It is true that the experimental contracts disclosed their utility for the desired purpose, but the invention itself had been at least constructively reduced to practice through the filing of the application for patent on February 17, 1917, and the experimental contracts relied upon were not executed until June 11, 1911. It is true the plaintiff had been engaged prior to this time in experimental work with the War Department for the development of star shells suited to the department’s needs, but the problem presented by the use adaptable to Army and Navy guns varied materially, and there is nothing surrounding the contractual relationship of the parties at this early date which indicates the development of the patents as a result thereof. The sequence of events set forth in the findings conclusively discloses that the above inventions were the independent conception of the inventor, prior to and without the aid_.and benefit derived from the experimental contráete antedating the principal contract. The original application, #149260, which matured into patent #1305186 and divisional patent #1305188, was filed the same day as the first interview with the Navy Department, having been effected several days prior thereto, an interview which finally culminated in the experimental contracts, and they in turn culminated in a demonstration to the satisfaction of the department of the utility of the patents and a contract for quantity production. On November 23,1918, these contracts, #39716 and 39716-A, were terminated by the defendant. On the date of termination the plaintiff had 1,000 shells about 82% complete, and in a short time would have delivered the same. The exercise of the right to terminate of course set aside the contract, and the reasons assigned clearly import an intention upon the part of the defendant to avail itself of this unilateral provision because of an alleged delay in performance and the termination of the war. The contract contains no provisions authorizing the defendant to proceed in the manufacture of star shells in accord with plaintiff’s design in the event of termination. The nearest approach to such a right, and the provision upon which the defendant relies for a license to *355 use the plaintiff’s patents, are found in subparagraph (e) of contract #39716, as follows:
“(e) Cost of necessary machinery and equipment, patterns, and drawings, and temporary structures needed for the utilization and protection thereof acquired exclusively for and devoted solely to Navy work: Provided, That the acquisition or construction of all such property by the contractors shall be approved in advance by the department. The title to all such property shall, without further payment on the part of the department, vest in the department, and on termination of the contract the department may remove such machinery and equipment, patterns and drawings, and the materials- of such temporary structures, or it may sell the same as provided by law. All materials, machinery, equipment, patterns,_ drawings, appurtenances, supplies, etc., paid for under this contract by the department become thereby the sole property of the department and are left in the possession of the contractors only for the purpose of this contract, and such machinery, equipment, patterns, drawings, and temporary structures shall be devoted exclusively to the purposes of this contract.”
As previously observed, contract 39716 was a cost-plus contract, and doubtless without this express reservation the materials purchased by the Government for the performance of the contract belonged to the Government. Aside, however, from this fact, we are unable to discover from the terms of the reservation the grant of a license to use patents — i. e., an express grant. A different situation would exist if the contract provided that in the event of default upon the part of the contractor the defendant might continue by itself or another the manufacture of star shells until the full contract quantity was completed, and recoup the loss from the contractor. The termination clause invoked by the defendant put an end to the contract, released the contractor, and placed the parties back in the situation obtaining prior to the contract. The reservation clause, we think, accomplished no more than a retention in the Government of title to all the materials of the character enumerated, and restricted the use of all materials purchased by the Government to the performance of the contract. To extend the provisions of this clause to either an express or implied license to use a patented device under a cost-plus contract to *356 manufacture the same would, it seems to us, be the equivalent of converting a wholesome and manifestly precautionary covenant into an indefinite license to make and use whatever sort of a device the materials were available to make. The materials covered by the clause possessed salvage and utility value, consisting of electric motors, screw machines, hydraulic presses, dryers, etc., etc., machines and equipment of standard design and capable of being used for a variety of purposes other than the manufacture of star shells. The abundance of the prior art cited in this case by the defendant clearly establishes that the star shell inventions covered by patents #1305186 and #1305188 are but limited improvements, in no sense basic, and obviously there existed in the prior art many other illuminating shells which the'defendant was free to manufacture with this very machinery and materials. As a matter of fact, the defendant did this very thing, when of its own motion it changed the design. The defendant’s insistence that acquisition of title to the drawings and specifications of the patent carries with it the right of user falls clearly within the same category. /The defendant had advanced and paid the expense incurred in making the same. The contract imposed this obligation upon the defendant, but surely the title to drawings and specifications of a patent confers no right of user. Possession and title to the same was valuable to the defendant and subsequent events proved their worth.
It is to be noted that we have discussed the issue as to infringement of patents #1305186 and #1305188 on the basis of an issued patent. As a matter of fact, both patents were not issued until May 27, 1919, some time after termination of contract #39716. Therefore the case is again complicated with the determination of the question as to whether the plaintiff may claim infringement prior to the issue of letters patent under the act of October 6, 1917 (40 Stat. 394). This act reads as follows:
“ That whenever during a time when the United States is at war the publication of an invention by the granting of a patent might, in the opinion of the Commissioner of Patents, be detrimental to the public safety or defense or might assist the enemy or endanger the successful prosecution of the war *357 he may order that the invention be kept secret and withhold the grant of a patent until the termination of the war: Provided, That the invention disclosed in the application for said patent may be held abandoned upon it being established before or by the commissioner that in violation of said order said invention has been published or that an application for a patent therefor has been filed in a foreign country by the inventor or his assigns or legal representatives, without the consent or approval of the Commissioner of Patents, or under a license of the Secretary of Commerce as provided by law.
“When an applicant whose patent is withheld as herein provided and who faithfully obeys the order of the Cornmis^ sioner of Patents above referred to shall tender his invention to the Government of the United States for its use, he shall, if and when he ultimately received a patent, have the right to sue for compensation in the Court of Claims, such right to compensation to begin from the date of the use of the invention by the Government.”
Bergman’s first application, #149260, was filed February 17, 1917. On January 9, 1918, plaintiff received the secrecy order under the foregoing statute. (Finding XXXIII.) The secrecy order was rescinded December 20, 1918. The defendant asserts no charge of a failure upon the part of the plaintiff to observe secrecy, or in any manner disregard the inhibitions of the statute. The defense interposed is rested upon a failure to make a tender of the patent to the Government for use, and that the file wrapper and contents indicating procedure in the Patent Office demonstrate the inapplicability of the act. The plaintiff, on the other hand, alleges the series of disclosures and experimental contracts which finally resulted in contract 39716 and supplemental contract 39716-A as sufficient to constitute a tender. The requirement of a tender of an invention was, we think, regarded by Congress as an essential condition precedent to the right of recovery under the statute, because it afforded advance notice to the Government and the option to use or not use. The statute clearly contemplates a real tender— i. e., the bringing to the attention of the Government the. essential facts with reference to the invention so that subsequent use of the invention may prevail with knowledge of liability for the same. We can not read this provision out *358 of the statute. The plaintiff relies in part upon the disclosures repeatedly made in its plans, designs, and specifications to the defendant, as well as knowledge gained by the defendant through the experimental contracts. What facts constitute a tender is not always an issue of easy determination. In this case revolving around this particular point is the pertinent fact that the application for the patent, i. e., application 149260, was filed February 17, 1911, prior to the happening of the events relied upon to 'establish tender, and nowhere do we find an express tender of the invention to the Government. The negotiations pending at the time looked to express contracts; the plaintiff was concerned in securing express contracts, and the idea of user in response to a tender does not appear to have been within the contemplation of the parties. It is true that on November 20, 1917, the plaintiff addressed the letter set out in Finding XXXIV to the defendant, and emphasis is laid upon this fact as establishing tender; but this contention we think is untenable. In the first place, at the time the letter was written no secrecy order had issued from the Patent Office. The secrecy order is dated January 9, 1918, more than a month after the letter was written. The contents of the letter simply disclose an opinion that the application for a patent covers the idea of ejecting the lights through the rear of the 'shell, and assures the Government that the purpose of the plaintiff is simply to bring to the attention of the Government the existence of this fact without intending to interpose the same between the country and its needs. Just what is meant by the last clause is not evident. However, calling the attention of the Government to a pending application for a patent and the scope of the same, coupled with an assertion that patent rights if granted will not be taken advantage of in time of war, is not a compliance with a statute prescribing a tender for use of a patent at the time- not granted, and especially so when no injunction of secrecy obtained and no necessity for tender existed. The act extends a remedy under prescribed conditions, and until the conditions exist we see no way to anticipate them. The tender under the law follows the secrecy order; in the absence of a secrecy order the parties are at liberty to deal upon *359 the usual and customary basis as prescribed by the patent laws. The act of October 6, 1917, is special legislation covering unusual conditions and effective only when complied with.
While drawings, plans, and specifications disclose the detail of construction, they did not in this case warn the Government that user of the same involved an application to patent the device described. What happened herein was a series of experiments, an extended exchange of ideas, plans, and drawings, a mutual effort to arrive at perfection. True, it finally resulted in an express contract to manufacture by the plaintiff of its own design. Such a contract precluded the recovery of royalties under the law, or compensation under the act of October 6, 1917. The plaintiff accepted the consideration stated in the contract, not upon the basis of a monopoly of the device to be made, but predicated upon the manufacture of star shells, as shown by its submitted drawings and plans. The plaintiff was displeased with the termination of the contract and possessed full knowledge of the subsequent proceedings of the defendant, but at no time subsequent to the secrecy order warned the defendant that it was using, or tendered for use, an invention for which an ¡ application to patent had been previously filed. So that,, under the facts, we think the issue of infringement is limited to a period subsequent to the date of issue of the patent. Zeidler v. United States, 61 C. Cls. 537; Allgrunn v. United States, decided by this court June 18, 1928. [67 C. Cls. 1.]
CLAIMS INFRINGED
Claims 1, 2, 3, 4, and 6 of patent #1305186 cover the conception of multiple parachutes, one as a retarding and the other a sustaining device, claims heretofore discussed on the issue of validity. It is, we think, sufficient to say that such a structure was manufactured by the Government from the beginning of their production until the Government in May, 1922, changed the design. (Findings XLIII and XLIY.) The contracts, #39716 and 39716-A, were terminated November 23, 1918, and the Navy Department began manufacture at once. Compensation for the use for the period of *360 time extending from the execution to the termination of the contract is included in the $35,000.00 awarded the plaintiff as fair and just settlement. Subsequent to termination the Government continued to manufacture star shells embodying the plaintiff’s invention and infringement of the above claims by manufacture is found from May 27,1919, the date of issuance of patent #1305186, until May, 1922, when the Government changed the design to the use of a single parachute so designed that after ejection from the projectile it was partially turned inside out and a minimum of its surface exposed. A fuse link adapted to function at a predetermined period after ejection released a binding cord, thus enabling the parachute to spread so that its entire surface was available as a sustaining element for the illuminant. The novelty of claims 1, 2, 3, 4, and 6 resides in the use of multiple parachutes. The claims, as heretofore observed, were restricted and narrow; therefore, it is our conclusion that the Government’s device subsequent to May, 1922, does not infringe these claims.
Claims 8, 9, 10, and 11 of patent #1305186 embody a broader conception than the preceding group. It was, we think, decidedly new and novel to successfully invent what we may designate as the “ rear-ejection claims.” In view of the prior art, the rear ejection feature had not been accomplished before. This group of claims has been continuously infringed from May 27, 1919, at least to the date of filing the petition in this case. (Findings XLIII and XLIY.)
The final group of claims, 15, 16, and 17 of patent #1305186, is quite similar to claims 1, 2, 3, 4, and 6 of the same patent. The difference is principally involved in a phraseology emphasizing the operation at service speeds or at different points in the trajectory, as hereinbefore discussed. Claim 15 is directed to the sustaining and retarding means and is therefore only infringed by shells manufactured between May 27, 1919, and May, 1922. Claims 16 and 17 provide “ means for retarding and subsequently sustaining the illuminant at any such predetermined point.” This, we think, limits the prior claims to the extent at’least of a conception which includes within its scope not only a retarding and sustaining device, but the addition of means *361 to function the illuminant at any predetermined period of time in its flight. Whether these claims are broad enough to cover the use of a single means for accomplishing the same purpose, as used by the Government subsequent to May, 1922, is, we must concede, doubtful. The subsequent separate references in these claims to a “ retarding element ” and a “ sustaining element ” impose a clear limitation on the word “ means,” and indicate a concept of the two individual elements. Under these circumstances, we are inclined towards the view that claims 16 and 17 may not be extended to cover the device manufactured by the Government subsequent to May, 1922. The claims when considered with the prior group, 1, 2, 3, 4, and 6, in the light of the specifications and claims asserted with respect to retarding and sustaining devices, obviously limit the inventive conception to multiple parachutes to accomplish the purpose. The use of a single element adapted towards this end seems to have escaped the patentee; the language of the patent precludes a reading of the claims on the single parachute used by the Government after May, 1922.
Claim 5 falls within the same category as claims 1, 2, 3, 4, and 6.
PATENT #1305188
Claim 1 of this patent is not infringed. The claim is limited to a structure involving a retarding parachute attached to an inner casing and a sustaining parachute within the inner casing. The defendant did not use a device either identical or similar to the one claimed.
Claim 3, as hereinbefore held, is anticipated and invalid.
Claim 8 is more troublesome. The claim is directed to the separable means for housing the illuminant in the shell, which housing is adapted to receive the force of the expelling charge. The record sustains the use by the Government of an illuminant contained in a multiple part segmental casing. The Government unquestionably inclosed the illuminant and the parachute in a segmental casing. (Finding XLIII and XLIY.) This was done prior and subsequent to May, 1922. The claim may not be limited to. the multiple parachute system; it is broader, and we think is capable of *362 being read upon the Government device, manufactured both prior to and after. May, 1922.
What we hold is that claims 1, 2, 3, 4, 5, 6, 15, 16, and 17 of patent #1305186 were infringed by the Government in the manufacture of star shells after May 27, 1919, and prior to May, 1922; that claims 8, 9,1Ó, and 11 of the same patent have been infringed after May 27, 1919, and May, 1922, and that claim 8 of patent #1305188 has been infringed both prior and subsequent to May, 1922.
There are many other questions discussed in the briefs. To give express attention to each would involve this opinion in additional complications of great length. The court has gone over each with careful attention. A record like the one in this case, covering a volume of testimony and exhibits of exceptional size, exacts extensive findings. The court has gone over the requests as carefully as possible and condensed the same within all possible limits. The parties having stipulated that, in the event of a favorable finding for the plaintiff as to the patents involved herein, the case is to be remanded for proof as to damages upon this single issue, in accord with the opinion of the court the conclusion attached to this opinion carries out this stipulation, and an order of the court will be made referring the case to Commissioner Hayner H. Gordon for further proof, as herein stated.
SiNNOtt, Judge, and GkeeN, Judge, concur.
Graham, Judge, took no part in the decision of this case; Moss, Judge, took no part on account of illness.